United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WILLIAM SCHECHNER and<br>JOHN LOBERTINI | No. C 08-05049 MHP |
| Plaintiffs, | **MEMORANDUM & ORDER** |
| v. | **Re: Defendant's Motion for Summary Judgment** |
| CBS BROADCASTING, INC. | |
| Defendant. | |

Plaintiffs William Schechner ("Schechner") and John Lobertini ("Lobertini") (collectively "plaintiffs") filed this action against defendant CBS Broadcasting Inc. ("CBS" or "defendant"). Plaintiffs allege that defendant discriminated against them by firing them from positions as on-air reporters at KPIX-TV ("KPIX") in San Francisco, California, on the basis of their age and gender in violation of California's Fair Employment and Housing Act, Cal. Civil Code §§ 12900 *et seq.* Now before the court is defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. Having considered the parties arguments and submissions and for the reasons set forth below, the court enters the following memorandum and order.

BACKGROUND[1]

Schechner and Lobertini were fired from their jobs as on-air reporters at CBS-owned San Francisco news station KPIX in March 2008. At the time, Schechner was 66 years old and Lobertini was 47 years old. Docket No. 44, Aff. 1 (Schechner Dec.) ¶ 2; Docket No. 44, Aff. 2 (Lobertini

Dec.) ¶ 1. Schechner and Lobertini's contracts with KPIX were scheduled to expire later that year in December and November 2008 respectively. Docket No. 36 (McClain Dec.), Exh. A (Schechner Dep.) at 10, 83; Docket No. 57 (McGuinn Dec.), Ex I (Lobertini Employment Agreement) at 3. Although plaintiffs were fired before their employment contracts expired, both plaintiffs received all compensation benefits under their contracts and were offered severance payments, which they both declined. McClain Dec., Exh. E (Lobertini Dep.) at 81; Schechner Dep. at 132.

Plaintiffs were fired as a result of a March 12, 2008, mandate, whereby CBS required KPIX and other CBS-owned television stations to reduce annual expenses by 10%. Docket No. 37 (Vandall Dec.), Exh. E (Response) at 4. Although CBS did not specifically require that stations implement a reduction-in-force to meet the mandate, KPIX, led by Ron Longinotti ("Longinotti"), President and General Manager, and Daniel Rosenheim ("Rosenheim"), Vice President and News Director, instituted a reduction-in-force on March 31, 2008. *Id.* As part of the reduction-in-force, Longinotti and Rosenheim terminated five employees classified as on-air talent, including plaintiffs Schechner and Lobertini. Docket No. 40 (Rosenheim Dec.) ¶¶ 3 & 5; McGuinn Dec., Exh. 1 (Longinotti Dep.) at 62. A sixth on-air reporter, Barbara Rodgers, age 61, left the station at around the same time, although the parties dispute whether she was fired or left voluntarily. The phrase on-air talent was described by Longinotti as an individual who works on-air and who was a member of the American Federation of Television and Radio Artists ("AFTRA"). *Id.* at 64. The five on-air employees selected for layoff were all male and ranged in age from 47 to 66 years old. McGuinn Dec., Exh. 2.

The process by which defendant selected individuals to terminate as part of the reduction-in-force is key to the dispute in this action. To better understand the selection process, the court will define terms relevant to employment at KPIX and the reduction-in-force. The pool of on-air talent at KPIX is comprised of general assignment reporters, anchors, anchor-reporters and specialty reporters. General assignment reporters cover stories of general interest, including breaking news. Rosenheim Dec. ¶ 4. Anchors and anchor-reporters are the positions at KPIX most well-known to the public because they are on-air most regularly and are considered the "face" of KPIX. *Id.*

2

Specialty reporters are associated with a particular "beat" or area of coverage, such as consumer, medical, environmental or political issues. *Id.* The pool of on-air talent at KPIX is also divided between individuals who have and do not have personal service contracts with KPIX. Personal service contracts are granted to individuals to which KPIX wants to commit for an extended period of time; some on-air employees at KPIX have personal service contracts, while those who do not are at-will employees. McClain Dec., Exh. N (Rosenheim Dep.) at 20; Longinotti Dep. at 63-71. These personal service contracts are known as "pay or play" agreements, whereby KPIX can choose to require the performance of the employee or discharge its obligations under the agreement by paying the contracted compensation through the term of the agreement. Rosenheim Dec. ¶ 5.

Longinotti and Rosenheim assert that they selected which on-air talent to discharge as part of the reduction-in-force in the following manner: Longinotti and Rosenheim first determined that only general assignment reporters with personal service contracts would be eligible for the reduction-in-force. McGuinn Dec., Exh. 6 (Rosenheim Dep.) at 114; Rosenheim Dec. ¶ 5. Out of those individuals, Longinotti and Rosenheim would select for termination those general assignment reporters whose personal service contracts would expire the soonest. Rosenheim Dep. at 114.

Plaintiffs have submitted some evidence that suggests that defendant did not follow this admittedly age and gender neutral plan for the reduction-in-force. First, Longinotti made conflicting statements regarding the plan to fire some on-air talent as part of the reduction-in-force. In his deposition, Longinotti admitted that whether an employee had a personal service contract was not a factor in selecting individuals for termination. Longinotti Dep. at 173-74. Subsequently, Longinotti corrected the transcript of his testimony to state that personal service contracts were considered in selecting which individuals were eligible for termination. Docket No. 46 (McClain Reply Dec.), Exh. C.

Secondly, there is some evidence that defendant fired individuals who were not general assignment reporters. Rosenheim stated that although plaintiffs were fired according to the reduction-in-force plan, a sports anchor named Rick Quan ("Quan") was also laid off, purportedly for unrelated reasons concerning the sports department. *Id.* Quan was 51 years old when he was

3

terminated and was replaced by Kim Coyle, who was 38 years old at the time and did not have a personal service contract. Docket No. 44, Aff. 6 (Quan Dec.) ¶ 2; Docket No. 44, Aff. 4 (Lepowsky Dec.), Exh. 1 at 5.

Thirdly, plaintiffs have produced evidence that not all general assignment reporters were fired based on their contract expiration dates. Specifically, Simon Perez ("Perez") was a 41-year-old general assignment reporter at the time of the reduction-in-force. Lepowsky Dec., Ex. 1 at 5; Longinotti Dep. at 244. Perez had a contract set to expire in January 2008, and so should have been part of the reduction-in-force according to plaintiffs. McGuinn Dec., Exh. 3. Plaintiffs have provided some evidence that Perez' multi-year, more than $400,000 contract was still being negotiated in April 2008, just after the reduction-in-force. McGuinn Dec., Exh. 10. Jose Vasquez ("Vazquez"), a 42-year-old general assignment reporter, had a contract with an expiration date of February 29, 2008, but negotiated a new multi-year, $541,000 contract on March 24, 2008, just after the cost reduction mandate was handed down from CBS. McGuinn Dec., Exh. 5 at 3; Rosenheim Dep. at 58, Exh. 11 (Employment Agreement). Defendant provided some evidence that both Perez' and Vazquez' contracts were negotiated and approved for renewal before the reduction-in-force and were retroactively dated to January and February 2008 respectively. Rosenheim Dec. ¶ 6.

Fourthly, plaintiffs provided evidence that two of the on-air talent selected for termination under the reduction-in-force were not general assignment reporters. Tony Russomanno ("Russomanno") was laid off as part of the reduction-in-force at age 57. Docket. No 44, Aff. 5 (Russomanno Dec.) ¶ 2, 21. Although defendant and plaintiff Lobertini have classified Russomanno as a general assignment reporter, Russomanno claims and has provided evidence that KPIX considered him an environmental specialty reporter. Lobertini Dep. at 110; Russomanno Dec. ¶ 14; Russomanno Dec., Exh. 1. Specifically, plaintiffs have provided evidence establishing that Rosenheim gave Russomanno business cards identifying Russomanno as "Environmental Reporter." *Id.* Additionally, plaintiff Lobertini claims he himself was not a general assignment reporter as asserted by defendant. Although Lobertini admitted in his deposition that he was a general assignment reporter at KPIX, Lobertini maintains that his work focused largely on politics and that

4

KPIX considered him a political specialty reporter. Lobertini Dep. at 110; Lobertini Dec. ¶¶ 5-7. In their own depositions, however, both plaintiffs characterized Russomanno and Lobertini as general assignment reporters.

Finally, plaintiffs have provided a statistical report compiled by Professor William Lepowsky ("Lepowsky") that purportedly demonstrates, to a statistically significant degree, that the age makeup of the individuals who were fired was extremely unlikely to occur by chance. *See* Lepowsky Dec., Exhs. 1-3. The specific results of Lepowsky's report are discussed in greater detail below.

Plaintiffs contend they were discriminated against based upon age and gender, and that defendant's claims regarding the contract expiration standard for the reduction-in-force are pretextual in nature. *See* Docket. No. 1 (Compl.). In June 2008, Lobertini filed a complaint with the California Department of Fair Employment and Housing. *Id.* ¶ 26. In July of 2008, Schechner filed an Equal Employment Opportunity Commission charge. *Id.* ¶ 11. After receiving right to sue letters, Lobertini and Schechner filed the complaint in the instant action on October 16, 2008, in the Superior Court for the City and County of San Francisco. Docket No. 1. Defendant removed the action to this court on November 5, 2008. *Id.*

LEGAL STANDARD

Summary judgment is proper when the pleadings, discovery, and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the proceedings. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). On an issue for which the opposing party will have the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

5

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Mere allegations or denials do not defeat a moving party's allegations. *Id.*; *see also Gasaway v. Northwestern Mut. Life Ins. Co.*, 26 F.3d 957, 960 (9th Cir. 1994). The court may not make credibility determinations and inferences drawn from the facts must be viewed in the light most favorable to the party opposing the motion. *Anderson*, 477 U.S. at 249; *Masson v. New Yorker Magazine*, 501 U.S. 496, 520 (1991).

DISCUSSION

Schechner and Lobertini assert claims of age and gender discrimination under California's Fair Employment and Housing Act (FEHA), Cal. Gov't Code §§ 12940 *et seq*. As the bulk of the briefing and evidence speaks to the age discrimination claims, the court addresses the age discrimination claims first.

I.    Age discrimination

FEHA makes it illegal to, among other things, fire an individual on the basis of his or her age or gender. Cal. Civil Code § 12940(a).[2] FEHA proscribes two separate types of age discrimination: "(1) discrimination arising from an employer's intentionally discriminatory act against an employee because of his or her [age] (referred to as disparate treatment discrimination), and (2) discrimination resulting from an employer's facially neutral practice or policy that has a disproportionate effect [on employee's over the age of 40] (referred to as disparate impact discrimination)." *Avila v. Continental Airlines, Inc.*, 165 Cal. App. 4th 1237, 1246 (2008). Given similarities between California and federal discrimination laws, "California courts look to pertinent federal precedent when applying [its] own statutes." *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 354 (2000). The plaintiffs have elected to proceed on both theories of age discrimination.

A.    Disparate treatment

To facilitate the analysis of disparate treatment lawsuits at the summary judgment stage, California has coopted the well-worn, three-stage burden shifting analysis established by the United

6

States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, in order to prevail on a claim of disparate treatment, a plaintiff must first establish a prima facie case that gives rise to an inference of unlawful discrimination. If the plaintiff succeeds in establishing a prima facie case, the burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct. If the defendant provides such a reason, then the burden returns to the plaintiff, who always retains the burden of proof, to show that the employer's reason is a pretext for discrimination. *Id.* at 802-05; *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008). "As a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment." *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1124 (9th Cir. 2000). It is sufficient if the plaintiff raises a triable issue of fact to overcome the motion for summery judgment. This may be done by "direct evidence of the employer's discriminatory motive" or by "indirect evidence that undermines the credibility of the employer's articulated reasons." *Noyes v. Keely Sevs.*, 488 F. 3d 1163, 1170-71 (9th Cir. 2007).

### 1. Prima facie case

A plaintiff establishes a prima facie case of age discrimination by demonstrating that "he was (1) at least forty years old, (2) performing his job satisfactorily, (3) discharged, and (4) either replaced by substantially younger employees with equal or inferior qualifications or discharged under circumstances otherwise 'giving rise to an inference of age discrimination.' " *Diaz*, 521 F.3d at 1207 (quoting *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000)).[3] "An inference of discrimination can be established by 'showing the employer had a continuing need for [the employees'] skills and services in that their various duties were still being performed . . . or by showing that others not in their protected class were treated more favorably.' " *Id.* at 1207-08 (quoting *Coleman*, 232 F.3d at 1281) (quotation marks and citation omitted). "The requisite degree of proof necessary to establish a prima facie case . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994).

7

The parties do not dispute that both plaintiffs satisfy the first three elements of the prima facie case. Defendant does contend, however, that the record in this case, viewed in the light most favorable to plaintiffs, is insufficient to establish that plaintiffs were discharged under circumstances suggesting that defendant discriminated against plaintiffs because of their age. Plaintiffs counter that three separate pieces of evidence permit a finding of an inference of age discrimination.

The first piece of evidence—that in 2005 Rosenheim removed Schechner from his position as weekend morning anchor, called Schechner's performance "lackluster" and replaced Schechner with a 39-year-old—is plainly insufficient. To begin with, Schechner's removal from the weekend anchor position could not possibly support an inference of discrimination against Lobertini because the incident related to only Schechner. But the removal is no more illuminating with respect to Schechner, because of its temporal distance from the reduction-in-force at issue in this case. In addition, despite plaintiffs' protestations to the contrary, the word "lackluster" is not generally used as a synonym for "old." Rather, it means "1. lacking brilliance, radiance, liveliness, etc; dull or vapid. 2. a lack of brilliance or vitality." Random House College Dictionary (rev. ed. 1982). Even if the court were to interpret "lackluster" as a euphemism for "old", Rosenheim's use of the word to describe Schechner would not be sufficient to carry Schechner's prima facie burden. Stray discriminatory remarks not uttered in the context of an employee's termination are generally insufficient to establish a prima facie case. *See Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir. 1993). As a result, Schechner's removal from his weekend anchor position is not relevant to plaintiffs' prima facie case.

The second piece of evidence—that in 2008, Rosenheim renewed 56-year-old non-plaintiff Russomanno's contract for only one year, instead of three years, as had occurred in the past—is even more attenuated from the discrimination plaintiffs claim they experienced. It is not at all apparent how the fact that Rosenheim offered Russomanno a one-year contract has any relevance, whatsoever, to whether Rosenheim or Longinotti fired plaintiffs with discriminatory intent. Similarly, that defendant's offered Russomanno a one-year contract while offering two other,

8

younger general assignment reporters three-year contracts, during the same time period, also provides no insight into Rosenheim or Longinotti's intent toward Schechner and Lobertini.

The third and final piece of evidence—Lepowsky's statistical analysis of the reduction-in-force's effect on the age makeup of KPIX's on-air talent—presents a considerably closer question. Using information provided by defendant about the ages of all on-air talent at the time of the reduction-in-force, Lepowsky conducted an analysis to determine whether the age of the discharged employees was a factor in defendant's decisions regarding who to terminate. Lepowsky utilized three different methods: actual ages, age ranks, and age groups. Lepowsky describes the different analytical methods as follows. For the "actual age" analysis, Lepowsky asked "[i]f the . . . individuals [who were discharged] were selected from the pool of [eligible] individuals in such a way that age was not a factor in their selection, then what is the probability that the disparity between the mean ages would be at least as great as the disparity that was actually observed to have occurred?" Lepowsky Dec., Exh. 1 (Lepowsky Report) at 8. For the "age rank" analysis, Lepowsky ranked each eligible individual in order of their age, with the oldest employee ranking number 1, then asked "[i]f the . . . individuals [who were discharged] were selected from the pool of [eligible] individuals in such a way that age was not a factor in their selection, then what is the probability that the disparity between the mean age ranks [of those discharged and retained] would be at least as great as the disparity that was actually observed to have occurred?" *Id.* at 11. Finally, for the "age group" analysis, Lepowsky placed the on-air talent into five year age group tranches (30-34, 35-39, 40-44, 45-49, 50-54, 55-59, 60-64, and 65-69 years old), then asked whether "there is a statistically significant difference between those laid off and those not laid off, with respect to age groups. That is, is there a surprisingly great tendency for those laid off to . . ." come from the older age groups. *Id.* at 13. "Each analytical method was applied to two (2) possibilities regarding Barbara Rodgers (laid off; voluntarily departed). Also, each of those possibilities was analyzed with respect to two (2) scenarios regarding five anchors, namely that they were either included or not included" in the pool of employees eligible for termination. *Id.* at 1. All together, Lepowsky conducted 12 separate analyses (three methods with two separate binary options).

9

For each analysis, Lepowsky generated a "p-value," which measures "the probability that the reported association was due to chance." *In re Phenylpropanolamine (PPA) Prods. Liability Litig.*, 289 F. Supp. 2d 1230, 1236 n.1 (W.D. Wash. 2003). "Many courts have followed the social science convention which holds that for disparities below a 5% probability level ('P-value'), chance explanations become suspect." *Stender v. Luckly Stores, Inc.*, 803 F. Spp. 259, 323 (N.D. Cal. 1992) (Patel, J.).

Lepowsky's report shows that the age of KPIX's on-air talent correlated closely with defendant's decisions regarding whom to fire. In fact, for all twelve analyses he conducted, the p-values were less than 1.58%, indicating a relatively high degree of statistical significance. In the scenario with the least correlation (analyzing the actual ages of the employees, excluding Rodgers and including the five anchors), Lepowsky concluded that "[i]f age were not a factor in the selection of the five (5) individuals to be laid off, then there is only a 1.58% probability (or a 1 in 63 chance) that the mean age of the five (5) laid off individuals would be as great as it was . . . ." Lepowsky Report at 10. Lepowsky found that the situation with the greatest correlation (analyzing age ranks, including Rodgers, but excluding the five anchors) had a p-value of 0.21%, and would occur by chance only once every 476 times. *Id.* at 17. All the other scenarios fell between these two extremes.

The Ninth Circuit has held "that, if reliable, generalized statistical data is relevant and admissible at the prima facie case stage of a disparate treatment employment discrimination lawsuit." *Gay v. Waiters' and Dairy Lunchmen's Union, Local No. 30*, 694 F.2d 531, 550 (9th Cir. 1982); *see also Diaz*, 521 F. 3d at 1208-10. Importantly, however, "if the claim analyzed is individual rather than class, the statistics must be relevant to the particular plaintiff's claim." *Gay*, 694 F.2d at 550; *see also Ward v. Westland Plastics, Inc.*, 651 F.2d 1266, 1270 (9th Cir. 1980) (per curiam) ("Regardless of how devastating or reliable the statistics may look, the issue remains in [disparate treatment] cases whether a particular isolated historical event was discriminatory."). Accordingly, where a plaintiff chooses to rely solely on statistical evidence to carry his prima facie burden, "[he] must show a stark pattern of discrimination unexplainable on grounds other than age."

10

*Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1423 (9th Cir. 1990) (quoting *Palmer v. United States*, 794 F.2d 534, 539 (9th Cir. 1986) (quoting *Village of Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 266 (1977))); *see also Coleman*, 232 F.3d at 1282 (holding that a statistical analysis that failed to "take into account any variables other than age" was not sufficient to satisfy the fourth element of the prima facie case). Any other approach "would almost completely blur the distinction between 'impact' and 'intent,' and thus eliminate the legal difference between disparate impact and disparate treatment lawsuits." *Gay*, 694 F.2d at 532.

In practice, the Ninth Circuit's "unexplainable on grounds other than age" standard has meant that plaintiffs relying solely or even primarily on statistical evidence have been unable to satisfy the prima facie case. *See Coleman*, 232 F.3d at 1282 (holding that evidence that employees over the age of 40 were laid off at twice the rate as those under 40, a disparity that would occur by chance 3 in 100 billion times, was "problematic" because it failed to account for any variables other than age); *Rose*, 902 F.2d at 1423 (holding that evidence that employees over 50 were laid off at a rate nearly three times higher than those under 50 was "insufficient" because it failed to take into account that older individuals tend to occupy the level of positions eliminated during the reduction-in-force); *Palmer*, 794 F.2d at 539; *Gay*, 694 F.2d at 550-56. In the few cases in which statistical evidence aided a plaintiff in establishing a prima facie case, the plaintiff bolstered his claim of discriminatory intent with other pieces of non-statistical evidence. *Diaz*, 521 F.3d at 1210 (defendant was aware of plaintiffs' ages but still decided not to fire several younger, less experienced workers); *Pottenger v. Potlach Corp.*, 329 F.3d 740, 747 (9th Cir. 2003) (comments made in the course of discharge).

A consequence of the Ninth Circuit's development of this area of law is that, for lawsuits in which a plaintiff seeks to use statistical evidence as the primary support for his prima facie case, the three-step *McDonnell Douglas* analysis collapses into a single step. Specifically, where a plaintiff's statistical analysis fails to preemptively account for a defendant's legitimate, non-discriminatory reason for discharge, the statistical results cannot show "a stark pattern of discrimination unexplainable on grounds other than age." Not only does this state of affairs require that plaintiffs

11

put the proverbial cart (pretext) next to or before the horse (prima facie case), it places reduction-in-force plaintiffs, who frequently must rely on statistical evidence of discriminatory intent, at a distinct litigation disadvantage. In more "typical" discrimination suits, in order to satisfy the fourth element of the prima facie case, a plaintiff must merely show that he was replaced by someone outside of his protected group. Once the defendant comes forward with a legitimate non-discriminatory reason for terminating the plaintiff, the presumption of discrimination falls away. The burden then shifts to plaintiff to present some evidence that the defendant's explanation is a pretext for discrimination. Crucially, however, the jury is entitled to "infer the ultimate conclusion of discrimination" and may find for the plaintiff merely "from the falsity of the employer's explanation." *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). In other words, a plaintiff may prevail simply by showing that the defendant lied about its reason for firing the plaintiff.

Plaintiffs relying on statistical evidence are not so fortunate. The instant plaintiffs' predicament is emblematic. Because of the more arduous prima facie burden applied to statistical evidence in discriminatory treatment cases, plaintiffs cannot reach the third step of the *McDonnell Douglas* analysis. As a result, they are deprived of the opportunity to present non-statistical evidence of pretext. This is the case even though plaintiffs' statistical evidence plainly gives rise to "an inference of age discrimination." *Diaz*, 521 F.3d at 1207. This different set of rules for similarly situated plaintiffs—where introducing evidence that a plaintiff was replaced by someone from outside his protected class, and nothing more, satisfies the prima facie case requirement, but where submitting evidence that older individuals were fired at a statistically significant higher rate does not—seems inherently backwards. Further, it has the effect of permitting savvy employers to eliminate older employees from the workplace during a reduction-in-force without any consequences, the exact harm that FEHA was enacted to prevent.

This court is, however, bound by the law of the Circuit. Lepowsky admitted at his deposition that his report does not take into account the sub-group of employees that Rosenheim and Lobertini purportedly targeted for termination (general assignment reporters with personal service contracts) or the method Rosenheim and Lobertini used to select from the group (earliest contract expiration).[4]

12

1  Instead, Lepowsky analyzed the entire group of on-air employees and ignored their contractual
2  status. Because Lepowsky's report does not account for defendant's legitimate non-discriminatory
3  justification, Schechner and Lobertini's statistical evidence falls short of establishing "a stark pattern
4  of discrimination unexplainable on grounds other than age." Plaintiffs have failed to present any
5  other evidence that independently or viewed in tandem with the statistical analysis, could give rise to
6  an inference of age discrimination. Accordingly, plaintiffs fail to satisfy the fourth element of the
7  prima facie case and defendant's motion for summary judgment on plaintiffs disparate treatment age
8  discrimination claim is GRANTED.

      b.    <u>Disparate Impact</u>

Defendant also contends that plaintiffs' claims of disparate impact should be dismissed. "Under the disparate impact theory, employees must prove that a facially neutral employment practice had a discriminatory impact on older workers." *Coleman*, 232 F.3d at 1291. "To make out a prima facie case of disparate impact, [a plaintiff] must show '(1) the occurrence of certain outwardly neutral employment practices, and (2) a significantly adverse or disproportionate impact on persons of a particular [age] produced by the employer's facially neutral acts or practices.' " *Pottenger*, 329 F.3d at 749 (quoting *Katz*, 229 F.3d at 835). If a plaintiff establishes a prima facie case, the burden shifts to the defendant who may (1) "either discredit the plaintiff's statistics or proffer statistics of his own which show that no disparity exists, [or (2)] produce evidence that its disparate employment practices are based on legitimate business reasons, such as job-relatedness or business necessity." *Rose*, 902 F.2d at 1424. "Thereafter, the plaintiff must 'show that other tests or selection devices, without a similarly undesirable [discriminatory] effect, would also serve the employer's legitimate interest in efficient and trustworthy workmanship.' " *Id.* (quoting *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 998 (1988)) (some internal quotation marks omitted).

Whereas the parties comprehensively briefed the issues presented by plaintiffs' disparate treatment claims, the parties gave short shrift to the disparate impact claims. Defendant presents only two, barely reasoned arguments for why plaintiffs should not be permitted to proceed with their disparate impact claims. First, defendant contends that plaintiffs' complaint fails to enunciate a

13

claim for disparate impact. To the contrary, the complaint spells out, albeit less than perfectly, that plaintiffs were pursuing both disparate treatment and disparate impact claims. Compl. ¶ 2 (alleging that CBS "designed and implemented its workforce reduction process to eliminate older employees which had a discriminatory, adverse impact on Plaintiffs and the other 12 employees [included in the reduction-in-force] on account of their age"). Unlike in *Coleman*, where the Ninth Circuit refused to consider a plaintiff's disparate impact claim when it was raised for the first time on summary judgment, plaintiffs here raised their claims of disparate impact in their complaint. *See* 232 F.3d at 1291-98.

Second, defendant suggests that Lepowsky's statistical analysis is insufficient, as a matter of law, to establish the second element of the prima facie case. Specifically, defendant asserts that the sample size of Lepowsky's study is too small from which to generate meaningful results. Again, defendant is mistaken. Lepowsky's report demonstrates a "significant" and "disproportionate" impact of defendant's reduction-in-force on older workers. Although Lepowsky's statistical analysis is insufficient to establish "a stark pattern of discrimination unexplainable on grounds other than age," it does show a disproportionate impact of the reduction-in-force on older workers. Within the subgroup of on-air employees, Lepowsky's analysis demonstrated a high degree of statistical correlation between those employees who were terminated and age. Importantly, the p-values generated by Lepowsky account for sample size.

However, rather than deny defendant's motion for summary judgment on the disparate impact claims outright, the court hereby orders additional briefing on the subject so that it might be adequately addressed by the parties. Accordingly, the parties are ordered to submit simultaneous briefs, not to exceed fifteen (15) pages, addressing whether defendant's motion for summary judgment on the disparate impact claims should be granted. The briefs shall be filed within thirty (30) days of the issuance of this order.

II.     Gender Discrimination

Defendant asserts that there is an absence of evidence to support plaintiffs' claims of gender discrimination. In their opposition, plaintiffs do not even attempt to identify evidence in the record

14

1 that might establish a genuine issue of fact regarding whether defendant discriminated against them
2 on the basis of their gender. Accordingly, defendant's motion for summary judgment on plaintiffs'
3 claims of gender discrimination is GRANTED.

4 III.     Damages

5     Finally, defendant asks this court to summarily adjudicate plaintiffs' claims for any wage-
6 related or punitive damages.

7     FEHA does not specify whether punitive damages are available to all plaintiffs suing under
8 its anti-discrimination provisions. In *Commodore Home Sys., Inc. v. Superior Court*, 32 Cal. 3d
9 211(1982), the California Supreme Court held that punitive damages may be available under FEHA,
10 but only "where the defendant has been guilty of oppression, fraud, or malice." *Id.* at 215 (quoting
11 Cal Civ. Code § 3294(a)). As discussed above, plaintiffs here have failed to establish a prima facie
12 case for intentional discrimination. Although the court has not yet assessed plaintiffs' disparate
13 impact claims, the court holds that the very nature of such claims precludes plaintiffs in this case
14 from satisfying California's standard for punitive damages. Under FEHA, in the absence of
15 intentional discrimination, punitive damages will not lie. This conclusion is bolstered by the
16 Supreme Court, which has held that punitive damages are not available to prevailing disparate
17 impact plaintiffs under Title VII. *See Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 529–30, 534
18 (1999). Accordingly, defendant's motion for summary adjudication of plaintiffs' prayer for punitive
19 damages is GRANTED.

20     With respect to plaintiffs' prayer for lost wages, defendant argues that such damages claims
21 should also be dismissed on summary judgment because there is no dispute that plaintiffs received
22 all compensation owed to them under their personal service contracts. Plaintiffs counter that it
23 would be unfair to limit plaintiffs' damages merely because they were under contract with
24 defendant. Because plaintiffs do not dispute they were paid the entire amount owed under their
25 personal service contracts or that defendant had any obligation to renew plaintiffs' contracts,
26 plaintiffs have not provided evidence that they are entitled to any contract-based damages for

economic loss. Therefore, defendant's motion for summary adjudication of plaintiffs' wage-based damages is GRANTED.

CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is GRANTED in part and DENIED in part.

Plaintiffs' age discrimination disparate treatment claims and plaintiffs' gender discrimination claims are dismissed. Further, plaintiffs' claims for punitive and wage-related damages are dismissed.

With respect to plaintiffs' claims of disparate impact discrimination, the parties are ordered to submit simultaneous briefs, not to exceed fifteen (15) pages, addressing whether defendant's motion for summary judgment on the disparate impact claims should be granted. The briefs shall be filed within thirty (30) days of the issuance of this order.

IT IS SO ORDERED.

Dated: July 14, 2010

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

**ENDNOTES**

1. Where facts are in dispute, the court has recounted plaintiffs' version. On a motion for summary judgment, the court may not make credibility determinations, must accept the nonmoving party's evidence as true and must draw all reasonable inferences in favor of the nonmoving party.

2. Section 12940(a) provides, in full:

> It shall be an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California:
>
> (a) For an employer, because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, or sexual orientation of any person, to refuse to hire or employ the person or to refuse to select the person for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment.

Cal. Civil Code § 12940(a).

3. As the Ninth Circuit has noted, "[g]enerally, an employee can satisfy the last element of the prima facie case only by providing evidence that he or she was replaced by a substantially younger employee with equal or inferior qualifications." *Id.* n.2. However, where an individual is discharged as part of a reduction-in-force, as in the instant case, the test must be altered to take into account that the individual was not replaced. In that context, "circumstantial evidence other than evidence concerning the identity of a replacement employee may also warrant an inference of discrimination." *Id.*

4. At deposition, Lepowsky admitted that he did not incorporate the mechanics of the selection process into his analysis. McClain Dec., Exh R. (Lepowsky Dep.) at 47. Lepowsky also admitted that he ran a statistical analysis "assuming that the people eligible for layoff with respect to the reporter classification were general assignment reporters with contracts," but chose not to include it in his report. *Id.* at 47-48. Lepowsky asserted that it showed a statistical significance with respect to age, but that he excluded it because there was "ambiguity about who it is, who should be classified as a general assignment reporter." *Id.* at 48.